IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:09-CR-00178-H-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| JODY EARL ELBERT, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the motion and amended motion of Defendant, Jody Earl Elbert, to suppress evidence seized and statements made as a result of Elbert's arrest and the search of his residence. [DE-59, 75.] The government has responded to both the motion and amended motion. [DE-63, 77.] To further develop the record, the Court conducted an evidentiary hearing on February 8, 2010, at which the government and Elbert with his counsel appeared. This matter is now ripe for decision.

I.  STATEMENT OF THE CASE

On June 18, 2009, a Federal Grand Jury charged Elbert in a one count indictment with aiding and abetting and knowingly and intentionally possessing with intent to distribute a quantity of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The indictment further alleged that Elbert committed the violations alleged after having two prior felony drug convictions.

In his motions, Elbert contends that the evidence seized and statements made as a result of his stop and arrest should be suppressed because (1) there was no probable cause to support the warrantless seizure of a paper cup containing cocaine; (2) the officers lacked reasonable suspicion to stop him; (3) the statements he made post- arrest are fruit of the poisonous tree; and (4) the post-

arrest search warrant for his residence was not supported by probable cause. Alternatively, Elbert seeks to exclude from evidence the cocaine found in a cup for failure to establish chain of custody.

## II. STATEMENT OF THE FACTS

Detective Marbrey and Sergeant Glendy, both members of the Raleigh Police Department ("RPD"), testified for the government at the suppression hearing and were the sole witnesses.

### A. Testimony of Detective Marbrey

Detective Marbrey has been employed by the RPD since 1998, and has worked the last three to four years as a detective in the street drugs and criminal enterprise drug unit. Prior to his employment with the RPD, Detective Marbrey was a police officer with the City of Garner. He attended the police academy for 26 weeks of training before joining the RPD and was trained in narcotics investigation, writing search warrants, and handling informants. He also received mandatory in-service training dealing with search and seizure as well as training conducted by the federal Drug Enforcement Administration. Detective Marbrey has executed over 100 search warrants and is familiar with the items commonly found at the residence of a drug dealer, such as ledgers, accounts, and evidence of other residences related to drug activities. He is also familiar with the terminology commonly used by drug dealers.

On or shortly before April 14, 2009, Detective Marbrey received a phone call from a confidential source ("CS1"), who stated that he was contacted by a Nathan Smith claiming to have a supplier in town with cocaine to sell. CS1 had worked with Detective Marbrey over the prior six to eight months as an unpaid informant providing "substantial assistance" to the police and had assisted in approximately ten drug buys. CS1 and Smith had been incarcerated together, and Smith

2

had discussed prior drug deals with CS1, but CS1 had never purchased drugs from Smith. Detective Marbrey had no prior relationship with Smith, but ran a criminal history check on Smith that revealed prior misdemeanor drug and alcohol offenses. Detective Marbrey decided they would attempt the drug buy from Smith's supplier.

Detective Marbrey and Sergeant Glendy, along with other detectives, held a briefing to plan the buy. Detective Marbrey did not want to use CS1 as the buyer in order to protect that source's identity for future use, so he arranged to use a second confidential source ("CS2") to act as the buyer. Detective Marbrey had worked with CS2 as an unpaid informant providing substantial assistance for approximately one year, and CS2 did not know Smith. The plan was for CS1 to pick-up Smith, who had no transportation, and take him to meet CS2. Smith and CS2 would then proceed to meet the supplier and make the buy. CS1 would not wear a wire because he was only transporting Smith and would not be involved in the actual buy. CS2 would be wired with a listening device, which Detective Marbrey would monitor while other detectives, including Sergeant Glendy, would provide visual surveillance.

CS1 came to the police station where he called Smith and arranged a buy for April 14, 2009, at approximately 8:00p.m. in the Capital Boulevard/Mini-City area of Raleigh, North Carolina. CS1 proceeded, under visual surveillance, to pick-up Smith at his residence and drove him to meet CS2. Smith left CS1's vehicle and entered CS2's vehicle. Both CS2 and his vehicle had been searched by law enforcement for contraband prior to the meeting, and CS2 was given buy money. Smith was not aware that he was involved in a law enforcement controlled drug buy and, consequently, Smith did not wear a wire and was not searched.

3

Smith instructed CS2 to drive to the McDonald's at Calvary Drive and Capital Boulevard where they would meet the seller with the cocaine. The two proceeded, under visual and audio surveillance, to the McDonald's, and when they entered the parking lot Smith pointed out a burgundy truck and said "that's my man." The occupant of the truck was later determined to be the Defendant, Jody Earl Elbert.[1]

Smith exited CS2's vehicle and entered Elbert's truck. After approximately two to three minutes, Smith returned to CS2's vehicle. Detective Marbrey, Sergeant Glendy and two other detectives maintained visual surveillance of both vehicles in the McDonald's parking lot, but had no audio of the discussions between Smith and Elbert and could not see below the windows in Elbert's truck. Smith told CS2 that Elbert had the 50 grams of cocaine divided into eight ball increments and showed CS2 a sample eight ball as proof that the cocaine was present. Detective Marbrey had directed CS2 not to pay any money until all the cocaine was present, and Elbert wanted the money before he would give Smith all the cocaine. Smith went back and forth between Elbert and CS2 in an attempt to negotiate an end to the stalemate. Smith then indicated that Elbert wanted to change locations and move across the street.

Elbert, followed by Smith and CS2, moved across the street to a parking lot adjacent to a Taco Bell and Food Lion. Elbert parked his truck on the side of the Food Lion and behind the Taco Bell, and CS2 parked in the middle of the Food Lion parking lot, some distance from Elbert. The Detectives also followed and continued their surveillance. Negotiations continued as before with

---

[1] Smith never referred to the seller by name and never identified the seller as Elbert to either confidential source. For clarity's sake, the Court will hereinafter refer to the seller as Elbert.

Smith acting as an intermediary, but ultimately no agreement was reached and Elbert called off the deal. At that point, Elbert was standing outside the Food Lion and proceeded to return to his truck. CS2 and Smith were in CS2's vehicle and began to back out of the parking lot.

Detective Marbrey followed CS2 and Smith for approximately two miles down Capital Boulevard and then directed a uniformed officer to make a traffic stop of CS2's vehicle. The officer recovered an eight ball of cocaine from Smith, for which he was charged and pled guilty, and recovered the approximately $2,000 in buy money from CS2. Sergeant Glendy and the other detectives remained at the Food Lion/Taco Bell location to monitor Elbert, who was eventually arrested, as described in the testimony of Sergeant Glendy, infra Part II.B.

Approximately one hour after Elbert's arrest, Detective Marbrey returned to the police department to interview Elbert. The interview was not recorded, and the only written documentation was Detective Marbrey's report. Detective Marbrey first read Elbert his Miranda rights and also provided Elbert a written copy to read. Elbert was advised and affirmatively responded that he understood that he did not have to answer questions, that he could have a lawyer, and that he could stop the questioning at any time. Elbert stated that he would waive his right to an attorney and talk to Detective Marbrey.

Elbert told Detective Marbrey that he had received a call from Smith who told him that he had a buyer for the cocaine. Elbert admitted instructing Smith to go to the Capital Boulevard area near Mini-City and then to call him for further instructions as to the specific meeting place. Detective Marbrey asked Elbert where he lived, and Elbert provided the address 312 Tryon Road, which Detective Marbrey knew to be an industrial complex. When confronted with that fact, Elbert

5

responded adamantly that 312 Tryon Road was his address. Elbert also stated that he was on federal probation for trafficking cocaine and that Scott Plaster was his probation officer.

Detective Marbrey learned from Plaster that Elbert lived on Deer Trace Lane, where Plaster had recently made a home visit to Elbert, and obtained a copy of a lease agreement in Elbert's name for that location. Detective Marbrey then obtained and executed a search warrant for Elbert's Deer Trace Lane residence, where he found clothes, a mattress, and miscellaneous documents including a list of bills, such as rent and phone, with amounts to be paid. Detective Marbrey also found handwritten notes that discussed "Mexican mud," "snow," and "green," which he knew to be slang for heroine, cocaine and marijuana. No controlled substances were found at the residence.

### B. Testimony of Sergeant Glendy

Sergeant Glendy has been employed with the RPD for 22 ½ years and has supervised the drug unit for the last three plus years. Sergeant Glendy was involved in planning and surveillance for the attempted drug buy from Elbert and testified as to the surveillance, stop, and arrest of Elbert.

Sergeant Glendy was in a covert police vehicle providing visual surveillance of Elbert, CS2 and Smith. He was also receiving updates from Detective Marbrey regarding the conversations between Smith and CS2. Sergeant Glendy followed Elbert, CS2 and Smith from the McDonald's to the Food Lion/Taco Bell parking lot, where he observed Elbert get out of his truck and walk toward the Food Lion. He saw Elbert and Smith arguing or posturing, which corroborated the information Sergeant Glendy received from Detective Marbrey that the two could not agree on whether all of the drugs or the money would be produced first. Sergeant Glendy observed Elbert return to his truck, and Detective Marbrey reported that the deal appeared to be off.

6

Sergeant Glendy made the decision to stop Elbert based on the statement made by Smith that Elbert had cocaine in his possession. Sergeant Glendy, in his unmarked police vehicle, approached Elbert's truck and from approximately 20 yards away saw Elbert enter the truck empty handed and then exit the truck holding a cup. Sergeant Glendy and the other detectives blocked in Elbert's truck with their vehicles so that Elbert could not drive away. Sergeant Glendy exited his vehicle, with his gun drawn but lowered, and ordered Elbert to the ground. Sergeant Glendy testified that Elbert looked around, as if he might run, threw the cup down, and lowered himself to the ground. The cup, a large McDonald's cup with a lid and straw, came to rest under the door of Sergeant Wesco's police vehicle. Sergeant Wesco picked up and opened the cup, which contained a number of eight balls of cocaine.

Elbert was handcuffed and questioned as to his name, address, and criminal history. Elbert gave his name, said he lived in Greenville, and said that he was on federal probation. Sergeant Glendy did not question Elbert about the incident that had just occurred.

## III. DISCUSSION

Elbert contends that all evidence seized and statements made following his stop and arrest should be suppressed because (1) there was no probable cause to support the warrantless seizure of the cup containing cocaine; (2) the officers lacked reasonable suspicion to stop him; (3) the statements he made post- arrest are fruit of the poisonous tree; and (4) the post-arrest search warrant for his residence was not supported by probable cause. Alternatively, Elbert seeks to exclude from evidence the cocaine found in the cup for failure to establish chain of custody.

### A. Warrantless Seizure of the Cup.

7

In his first motion to suppress, Elbert contends that the officers did not have probable cause to seize and search the cup that he retrieved from his truck just prior to his stop by law enforcement. Def.'s Mot. to Suppress at 4-5 [DE-59]. The government counters that Elbert abandoned the cup when he threw it down and that he has no standing to challenge its seizure. Gov't Resp. at 6-7 [DE-63]. At the hearing, Elbert argued that the abandonment theory does not apply because the cup did not leave his possession before he was detained.

"The law is well established that a person who voluntarily abandons property loses any reasonable expectation of privacy in the property and is consequently precluded from seeking to suppress evidence seized from the property." United States v. Leshuk, 65 F.3d 1105, 1111 (4th Cir. 1995) (citing Abel v. United States, 362 U.S. 217, 241(1960); United States v. Clark, 891 F.2d 501, 506 (4th Cir.1989)). The circumstances in the present case are similar to the case of United States v. Day, 229 F.3d 1144, at *1, *6 (4th Cir. Aug. 31, 2000) (unpublished op.), where the Fourth Circuit Court of Appeals affirmed denial of a defendant's suppression motion based on defendant's abandonment of the property seized.

In Day, the police officers entered a residential property following a lead related to drug activity. As the officers approached the front of the residence, the defendant walked off the porch toward them, but when they identified themselves as officers, the defendant turned and walked back to the porch. From approximately 15 feet away, the police officers saw a brown paper bag fall between the defendant's legs. One of the officers picked up and opened the bag, which contained smaller bags of cocaine. Id. at *1.

8

The defendant in Day was confined between the house and the approaching officers, much like Elbert was confined between his vehicle and Sergeant Glendy and the other officers, with no avenue for flight. The Day defendant dropped the bag of drugs from his hand, presumably to avoid being caught with it, much like Elbert threw down the cup of drugs. The fact that Elbert might not have abandoned the cup, but for the police stop, does not render his abandonment involuntary. See United States v. Kirlew, 291 Fed. Appx. 536, 538 (4th Cir. Sept. 5, 2008) ("[T]he fact that Kirlew vacated his car in an effort to evade capture by the police does not make his abandonment of the vehicle involuntary.") The Court concludes that Elbert voluntarily abandoned the cup, not because he was ordered, coerced, or otherwise forced to do so by police, but because he was attempting to avoid being caught holding a cup of cocaine. Elbert's voluntarily abandonment gave law enforcement justification for the warrantless search and seizure of the cup.

**B.     Reasonable Suspicion for the Stop.**

In his amended motion to suppress, Elbert contends that law enforcement had no reasonable suspicion that he was engaged in criminal activity because the information they relied on was uncorroborated information from Smith, an unwitting and unreliable informant, tantamount to an anonymous tipster. Def.'s Supplemental Mem. at 1-3 [DE-76.] Although the Court determined that Elbert abandoned the cup when he threw it down, "a person does not *voluntarily* abandon property when the abandonment results from police misconduct." Leshuk, 65 F.3d at 1111 (emphasis added). Consequently, the Court must determine whether the stop of Elbert, which led to his abandonment of the cup, was lawful.

9

> A law enforcement officer may initiate a brief investigatory stop if the officer has reasonable suspicion to believe that 'criminal activity may be afoot.' Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In determining whether an officer had reasonable suspicion, we view the totality of the circumstances to determine whether the officer had 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.' United States v. Cortez, 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Although the reasonable suspicion standard 'defies precise definition,' United States v. McCoy, 513 F.3d 405, 411 (4th Cir.2008), it is less demanding than probable cause, Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), and falls 'considerably short of satisfying a preponderance of the evidence standard,' United States v. Arvizu, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

United States v. Griffin, 589 F.3d 148, 152 (4th Cir. 2009). Anonymous tipsters are generally less reliable than known informants because they demonstrate no basis for their knowledge or credibility. Florida v. J.L., 529 U.S. 266, 270 (2000).

The facts of the present case are distinguishable from those where a stop is based solely on a phone call from an anonymous tipster. Here, Detective Marbrey and Sergeant Glendy, who had experience in working drug cases, had ample opportunity to observe Smith and his interactions with Elbert before making the determination to stop Elbert. The fact that Elbert met Smith and CS2 in a parking lot, then changed locations during the meeting to the Food Lion/Taco Bell parking lot, but never entered the Food Lion or Taco Bell is suspicious activity in the eyes of trained law enforcement, supporting a finding of reasonable suspicion to stop Elbert. See United States v. McCoy, 513 F.3d 405, 412-413 (4th Cir. 2008) (reversing district court's suppression of evidence on similar facts). Additionally, Smith did not know that law enforcement was listening to his statements, which lessens the risk that Smith was fabricating evidence to incriminate Elbert. Finally, two reliable informants were involved in setting up and executing the controlled buy. See United

States v. Artez, 389 F.3d 1106, 1112-13 (10th Cir. 2004) (concluding that the use of an intervening unwitting informant as a middleman between a confidential informant and a suspect did not invalidate a controlled purchase) (citing United States v. Blackwood, 913 F.2d 139, 142-43 (4th Cir. 1990) (rejecting argument that affidavit failed to establish probable cause, in part, because it lacked indicia of reliability regarding the actual purchaser of drugs, a non-informant intermediary between the suspect and the informant)). Based on all the facts and circumstances, the Court concludes that Sergeant Glendy had reasonable suspicion to believe that Elbert was engaged in criminal activity and was justified in conducting an investigative stop.

### C. Confession.

In his amended motion to suppress, Elbert contends that his confession must be suppressed as fruit of the poisonous tree. Def.'s Supplemental Mem. at 4-5. As a general rule, subject to certain exceptions, the "fruits" of police misconduct may not be used against a defendant. See Wong Sun v. United States, 371 U.S. 471, 484-85 (1963). Because the Court found no violation of Elbert's rights when law enforcement stopped him and seized the cup, his fruit of the poisonous tree theory fails. The Court also notes that Detective Marbrey testified that he advised Defendant of his Miranda rights, and Defendant has not disputed that contention or argued that his waiver was involuntary. The Court finds no basis to suppress the statements made by Elbert to Detective Marbrey.

### D. Search Warrant.

In his first motion to suppress, Elbert contends that the search warrant for his residence was not supported by probable cause because there was no connection between the drug buy and the residence. Def.'s Mot. to Suppress at 5-6.

11

In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched. Zurcher v. Stanford Daily, 436 U.S. 547, 556 & n. 6, 98 S.Ct. 1970, 1976-77 & n. 6, 56 L.Ed.2d 525 (1978). In Anderson, 851 F.2d 727, this court adopted the rule that "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." Id. at 729. The court held that probable cause can be inferred from the circumstances, and a warrant is not invalid for failure to produce direct evidence that the items to be seized will be found at a particular location. See id. (reasonable to infer that pistol and silencer would be found at defendant's residence).

United States v Lalor, 996 F.2d 1578, 1582 (4th Cir. 1993).

In the present case, the information in the probable cause affidavit for the warrant included (1) that Elbert was in possession of cocaine when he was detained; (2) that Elbert had claimed he did not have a current address but was staying in the Garner area; (3) that Elbert was on federal probation for trafficking cocaine; (4) that Elbert's federal probation officer informed Detective Marbrey that Elbert resided at 3421 Deer Trace Lane in Clayton and that Elbert was the only person on the lease; (5) that Detective Marbrey had extensive training and experience with drug investigations; and (6) that based on Detective Marbrey's training and experience he knew that drug dealers often keep written records of their drug sales and other related documents at their residences. The Court finds that these facts were sufficient for a magistrate to infer probable cause from the circumstances. As the Fourth Circuit Court of Appeals recently re-stated,

> [w]e have consistently determined that there was probable cause to support . . . warrants to search suspects' residences and even temporary abodes on the basis of (1) evidence of the suspects' involvement in drug trafficking combined with (2) the reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes.

12

United States v. Dawson, 305 Fed. Appx. 149, 163-64 (4th Cir. Dec. 31, 2008) (unpublished op.) (internal citations omitted); see also United States v. Grossman, 400F.3d 212, 217 (4th Cir. 2005) ("[O]ur cases indicate that a sufficient nexus can exist between a defendant's criminal conduct and his residence even when the affidavit supporting the warrant contains no factual assertions directly linking the items sought to the defendant's residence.") (internal quotation omitted).

At the hearing, Elbert additionally argued that the Court cannot find that the search was pursuant to a warrant because no warrant was introduced into evidence. The Court finds no merit in Elbert's argument that the government was required to introduce the warrant into evidence to prove its existence. Elbert cites no case law in support of this proposition and has not disputed that a search warrant was issued. Additionally, Detective Marbrey read the probable cause affidavit from the search warrant into the record at the hearing.

### E. Chain of Custody Issue.

Elbert contends in his amended motion to suppress that the RPD failed to document the chain of custody of the cocaine found in the abandoned cup seized in connection with Elbert's stop and that this evidence must be suppressed. The Court ruled from the bench at the hearing that the chain of custody issue was an evidentiary one that would be appropriately addressed by the trial judge. See Fed. R. Evid. 901 (a) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.")

13

## IV. CONCLUSION

Having found no support for Elbert's claims in the record, the Court **RECOMMENDS** that the motion and amended motion to suppress [DE-59, 75] be **DENIED**.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 25th day of February, 2010.

DAVID W. DANIEL
United States Magistrate Judge